## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
May 20 2016, 9:03 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANTS

Michael B. Troemel
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of C.B., Mother, B.G., Father, and N.W., S.G. and R.B., Minor Children,

C.B. and B.G.,

*Appellants-Respondents,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

May 20, 2016

Court of Appeals Case No.
79A04-1506-JT-736

Appeal from the
Tippecanoe Superior Court

The Honorable Thomas K. Milligan, Senior Judge

Trial Court Cause Nos.
79D03-1409-JT-39
79D03-1409-JT-40
79D03-1409-JT-41

**Kirsch, Judge.**

[1] In a joint proceeding, the juvenile court terminated the parental rights of C.B. ("Mother") as to her minor children, N.W., S.G., and R.B., and the parental rights of B.G. ("Father") as to his minor child, S.G. Mother and Father ("Parents") appeal, raising the following consolidated and restated issues:

> I. Whether the juvenile court's termination order as to Mother is clearly erroneous; and

> II. Whether the juvenile court's termination order as to Father is clearly erroneous.

[2] We affirm.

## Facts and Procedural History

[3] Mother is the biological parent of three daughters N.W., S.G., and R.B (collectively, "Children"), who were born in October 2001, May 2006, and June 2011 respectively. Father is the biological parent of S.G.[1] In April 2013, Children were living in Lafayette, Indiana with Mother, her former boyfriend ("S.S."), and his two children, one of whom was three-year-old Z.S. In the afternoon of April 12, 2013, Z.S. was taken to the hospital due to marks and bruises on his body, a laceration to his head, and lethargic behavior. *DCS Ex.* 1 at 2. Z.S. subsequently developed a subdural hematoma and was hospitalized

---

[1] The juvenile court also terminated the parental rights of N.W.'s father and of R.B.'s father; those fathers, however, do not appeal.

for several days. Mother admitted that she had "backhanded [Z.S.] because he wasn't listening" and that Z.S. fell backwards. *DCS Ex.* 1 at 2. It was determined that Mother's account of the incident did not match the nature and extent of the injuries. Mother was arrested that same day and charged with battery on a child and neglect of a dependent. Prior to Z.S.'s hospitalization, and Mother's resultant arrest, Mother had arranged for Children to be "cared for by their extended family"; N.W. and S.G. were cared for by their maternal grandmother ("Grandmother"), and the youngest child, R.B., was cared for by her maternal aunt ("Aunt"), Mother's half-sister. *Id.*

[4] The Indiana Department of Child Services ("DCS") became involved with the family while Z.S. was in the hospital and, on April 23, 2013, filed a petition alleging that Children were children in need of services ("CHINS"). In addition to the pending charges against Mother, further allegations were made that Mother had a history of: (1) excessive discipline of Children; (2) being overwhelmed with the responsibilities of parenting; (3) having relationships with inappropriate or violent men, some of whom had criminal histories; and (4) being the victim of domestic violence both as a child and in her relationships with men. Mother reported that as a child she was sexually abused by a family member and abused and neglected by her mother, Grandmother. *DCS Ex.* 3 at 57, *DCS Ex.* 4, *Vanderwater-Piercy Psychological Evaluation* at 11.[2] On June 4,

---

[2] DCS Exhibit 4 is not consecutively paginated; therefore, we refer to the page number of the specific report.

2013, the juvenile court appointed Lynn Davis to be the Child Appointed Special Advocate ("the CASA").

[5] A fact-finding hearing was held on the CHINS petition, and Children were found to be CHINS on June 18, 2013.[3] As to Mother, the juvenile court noted: (1) Mother's pending criminal charges regarding Z.S.; (2) reports from Mother's family that she had a history of using extreme discipline on Children, including the use of wooden spoons, belts, and her hand; (3) Mother had left eleven-year-old N.W. to take care of three to five children[4] and, via text message, told N.W. "to 'get out the belt' if the younger children misbehaved"; (4) Mother had written a letter to Children, while incarcerated, telling them she was sorry she had asked them to lie and it was "okay to tell the truth." *DCS Ex.* 2 at 44. As to Father, the juvenile court noted that he had not had consistent contact with S.G. and had not seen S.G. in about three months. *Id*. The juvenile court ordered Children to remain in their respective relative placements.

[6] DCS prepared a Predispositional Report, dated July 5, 2013, the findings of which the juvenile court adopted during its July 9, 2013 dispositional hearing. Those findings included: (1) Children had a strong connection to Mother's side

---

[3] The CHINS and the termination proceedings that took place between April 23, 2013 and October 2014 were heard in the court of Judge Faith Graham, with Magistrate Crystal Sandy presiding. Senior Judge Thomas K. Milligan presided over the four termination hearings in late 2014 and early 2015.

[4] There is a conflict in the record regarding the number of children N.W. was asked to watch. DCS reported that Mother had left N.W. to take care of up to six children, *DCS Ex.* 2 at 44, while the juvenile court found that Mother left N.W. to take care of three to five children. *Appellant's App.* at 39.

of the family; (2) none of Children had special medical needs or had used drugs; (3) N.W. and S.G. were at that time attending individual therapy; and (4) notwithstanding being in separate homes, Children were able to interact with each other in a meaningful way. *DCS Ex.* 3 at 60-61. Following the hearing, the juvenile court ordered Children to remain in relative placement and ordered Parents to participate in services set forth in the parental participation order with the goal of reunification. *DCS Ex.* 2 at 40.

[7] In October 2013, Mother pleaded guilty to neglect of a dependent with bodily injury as a Class C felony for the injuries she inflicted on Z.S. Mother was sentenced to four years—one year executed with Tippecanoe County Community Corrections ("Tippecanoe Corrections") on home detention, GPS monitoring, and three years on supervised probation. *DCS Ex.* 3 at 43-44. Mother was supervised by Tippecanoe Corrections Case Manager Jennifer Horn from November 19, 2013 until November 7, 2014. *Tr.* at 409. Mother was initially monitored as "high risk . . . due to her IRES[5] score and her history," but was later modified to moderate risk. *Id.* Mother was returned to high risk, however, after she violated the terms of her community corrections by: (1) missing a drug screen in March 2014; (2) having problems keeping her GPS charged while working for Indiana Packers; and (3) being "out of

---

[5] The record before us does not reflect the meaning of the acronym "IRES."

bounds."[6] *Id.* at 410. Mother also "received a work crew sanction," but asked that good time credit be taken away because she was unable to complete the work crew hours. *Id.*

[8] The juvenile court held a CHINS case review hearing in October 2013 and another in February 2014; Mother appeared in person at both hearings, and Father appeared at the latter hearing. In preparation for those hearings, DCS prepared three-month progress reports, one dated September 30, 2013 ("September Report") and the other dated December 30, 2013 ("December Report"). The September Report provided that Mother: (1) was inconsistent in her case management participation; (2) had participated in a psychological evaluation, but at DCS's directive, would have to complete a comprehensive psychological assessment with a parenting component; and (3) during the three-month period from July 9 to September 30, had maintained approximately twenty hours of supervised visitation per week. *DCS Ex.* 3 at 51, 52. Following the October 2013 hearing, the juvenile court ordered Mother to: (1) comply with the parental participation decree; (2) submit to random drug screens within twenty-four hours of request from DCS, the CASA, and service providers; (3) participate in Case Management once a week; (4) complete a parenting education course; (5) participate in individual and family therapy; (6)

---

[6] Case Manager Horn described these violations as follows: (1) Mother, for unexplained reasons, did not show up for a drug screen on the appointed day, but showed up and passed it the next day; (2) Mother's place of employment, Indiana Packers, was not a "home zone" so Mother's unit would continually attempt to charge, resulting in the GPS unit dying before she returned home; (3) Mother was out of bounds when she took Children to a McDonald's play area without giving prior notice to her case manager. *Tr.* at 410-14.

participate in visitation by agreement of treatment team; (7) participate in a comprehensive psychological evaluation with a parenting component; (8) continue to use the journal to facilitate visitation; (9) complete the RAISE Program, to address domestic violence, and follow all recommendations. *DCS Ex*. 2 at 36. Father was ordered to: (1) comply with the parental participation decree; (2) complete a parenting assessment, a mental health assessment, and a substance abuse assessment and follow the recommendations as to each; (3) participate in visitation pursuant to a treatment team agreement; and (4) submit to random drug screens within twenty-four hours of request from DCS, the CASA, and service providers. *Id*. at 37.

[9]     The December Report noted that, during the three-month period from September 30 to December 31, 2013, Mother maintained approximately twenty-five hours of supervised visitation per week, with no cancellations. *DCS Ex*. 3 at 41. Additionally, Mother participated in a comprehensive psychological evaluation with licensed psychologist Jeff Vanderwater-Piercy ("Dr. Vanderwater-Piercy"). Through that evaluation, Mother was diagnosed with: (1) "Anxiety Disorder Not Otherwise Specified (with features of posttraumatic stress)"; (2) "Major Depressive Disorder, Recurrent, In Remission"; and (3) "Personality Disorder Not Otherwise Specified (Mixed Personality Disorder with Dependent and Narcissistic Features)." *DCS Ex*. 3 at 35; *DCS Ex*. 4, *Vanderwater-Piercy Psychological Evaluation* at 11. The evaluation recommended that Mother participate in parenting education courses. The December Report noted that: (1) Mother was participating in or had

participated in individual therapy, parenting evaluation, visitation, psychological evaluation; (2) all of Mother's drug screens were clean; (3) Mother had obtained suitable, individual housing in her own name, (4) Mother maintained transportation; and (5) Mother maintained employment. *DCS Ex.* 3 at 40. Both the September and December Reports reflected DCS Case Manager Taylor Fristoe's ("Fristoe") assessment that Mother did not recognize her mental health issues. *Id.* at 40, 51. Following the February 2014 hearing, the juvenile court recommended that Children remain in relative placement and that Parents continue with previously-ordered services.

[10] The juvenile court held a permanency hearing in April 2014. In preparation for that hearing, DCS prepared a progress report ("Permanency Report"), dated April 15, 2014, which covered the time-period from December 31, 2013 to April 15, 2014. Like the December Report, the Permanency Report reflected that Mother maintained approximately twenty-five hours of semi-supervised visitation per week, and also attended the three Child and Family Team Meetings for that period. *DCS Ex.*3 at 28-29. DCS reported: (1) Mother does not believe Dr. Vanderwater-Piercy's assessment that she is narcissistic, stating that she always puts Children first; (2) Mother continues to hold the idea of DCS's involvement being the fault of others, including relative placement, believing that if DCS was "not involved that the case would be closed and the children would already be returned to her care"; and (3) somebody made a hotline report regarding bruising on R.B. and S.G after a visit with Mother; however, a follow-up investigation revealed that claims of Mother's

wrongdoing were unsubstantiated. *Id*. at 29, 30. DCS also reported, "[Mother] has presented as argumentative when conversing with DCS; however, when DCS is around [Mother], she does not raise her voice or become inappropriate in front of the children." *Id*. at 29. The Permanency Report showed that, in addition to Mother's participation in individual therapy, parenting evaluation, visitation, and a psychological evaluation, Mother has made herself available to meet with providers and the treatment team; has continued to have clean drug and alcohol screens; has obtained suitable housing in her own name; and has maintained employment and transportation. *Id*. at 25. At that time, Mother had successfully completed the RAISE Program through Bauer Family Resources ("Bauer"), to address issues of domestic violence. *Id*. at 25-26.

[11] The Permanency Report recommended that relative placement continue only until Mother finds appropriate and consistent childcare for Children. *Id*. at 21. The "team" had several Child and Family Team Meetings to discuss a plan. Services were offered to Mother "to address the underlying reasons for involvement, which [Mother] was cooperative [with] and engaged in." *Id*. DCS agreed that a trial home visit would be appropriate once Mother obtained an appropriate childcare plan. *Id*. In summary, DCS noted:

> Despite the disagreement about involvement, [Mother] has participated in services and improved with interaction through visits with the girls. She has maintained her housing and employment and has several strengths. [Mother] clearly has a strong bond with her children and they show the desire to be home with her. She has shown the ability to obtain childcare, but needs to maintain it. If [Mother] develops an appropriate

and consistent childcare plan, the team would like to move to a
trial home visit.

*Id*. at 30.

[12] In its April 22, 2014 Order on Permanency Hearing, the juvenile court accepted the Permanency Report as presented by DCS and placed Children in Mother's home for a trial home visit. Id. at 26. As part of its Order, the juvenile court ordered Mother to complete the following services: (1) "[s]ign a release for her therapist to release information to DCS and CASA"; (2) contact Wabash Valley Alliance ("Wabash Valley") to begin a transition plan for Children's services from Bauer; (3) "[c]ontinue to participate in case management"; and (4) "[c]ooperate with the IV-D Prosecutor in establishing paternity of [R.B]." DCS Ex. 2 at 26. It is not clear whether Mother completed these tasks.

[13] About one month later, on May 20, 2014, DCS Case Manager Fristoe filed a status report with the juvenile court, alleging that during the trial home visit: (1) S.G. and R.B had started to act out in school and daycare—S.G. was defiant and argues with the teachers, and R.B. "hit another child at the daycare" and has been atypically rude; (2) Mother failed to call S.G.'s case manager and therapist during the trial home visit; (3) Mother failed to provide R.G.'s current daycare with the necessary documentation and contact numbers; (4) DCS was unable to obtain records from Alpine Clinic concerning Mother's individual therapy; (5) Mother had her license suspended for failing to pay a speeding ticket; (6) Mother failed to inform DCS she was suspended from her job for five days "due to falling asleep on the clock"; (7) Mother had not been in

communication with DCS. *DCS Ex.* 3 at 16-17. Case Manager Fristoe asserted that Mother "hasn't shown her willingness and ability to provide her children with structure, stability, and appropriate services they need, while maintaining an attitude that she does not need to participate anymore, since [Children] are in her care." *Id.* at 17.

[14] The juvenile court held an emergency modification hearing on May 23, 2014. As part of its order, the juvenile court ordered Mother to complete the following tasks prior to the June 3, 2014 hearing: (1) set up an appointment for S.G.'s therapy; (2) communicate with S.G.'s case manager to set up a plan of action regarding S.G.; (3) obtain Mother's entire medical file from Alpine Clinic and provide a copy of the same to all parties; (4) take whatever steps necessary to reinstate driver's license; (5) apply for Food Stamps at the Medicaid Office; (6) obtain documentation showing all rent, utilities, and car payments are current; (7) provide the current daycare provider with any requested information and/or documentation; (8) provide a written plan for daycare plans for N.W and S.G. through the summer. *DCS Ex.* 2 at 19.

[15] During the June 3, 2014 hearing, the CASA testified that Mother was unable to accomplish these goals in a timely fashion. *Tr.* at 510-11. Wabash Valley Case Manager Tiana Evans ("Evans") reported that Mother was unable to secure stable daycare and could not obtain the necessary information for R.B.'s daycare provider. *DCS Ex.* 6, *May 2014 Wabash Valley Progress Report* at 2. At the conclusion of the hearing, the juvenile court removed Children from Mother's home and terminated the trial home visit.

[16] At the August 26, 2014 permanency hearing, the juvenile court changed the permanency plan to termination of Parents parental rights, and DCS filed its petition for termination of parental rights on September 9, 2014. *DCS Ex.* 2 at 7. The juvenile court held its termination hearing over multiple days— November 14 and December 15, 2014, and February 6 and March 5, 2015. At the termination hearings, DCS introduced three volumes of exhibits, which included periodic reports from DCS Case Manager Fristoe, and separate reports from Wabash Valley and Bauer, regarding Mother's progress with services. Also included in the exhibits were periodic reports about Mother's visitation with Children, her ongoing therapy, her drug screens, as well as periodic reports from the CASA. The following pertinent individuals testified at one or more of the four termination hearings: Mother; Father; Tiana Evans, who was Mother's case manager from Wabash Valley; Erica Eads, who was S.G.'s school and home-based case manager from Wabash Valley; Mother's brother; Aunt; Case Manager Fristoe, who, starting in August 2013, was Mother's DCS case manager; the CASA; N.W. and S.G., who were Mother's oldest two children; and Tippecanoe Corrections Case Manager Jennifer Horn.

[17] On May 26, 2015, the juvenile court issued its order terminating the parental rights of Mother and Father. The juvenile court included in its findings that Mother had a history of being the victim of domestic violence, using excessive discipline, being overwhelmed with the responsibilities of parenting, having liaisons or relationships with inappropriate and violent men, struggling with judgment and decision making, encouraging Children to lie, and failing to

obtain appropriate childcare providers. *Appellant's App.* at 38. Based on those and other factors, the juvenile court concluded:

> There is a reasonable probability the conditions that resulted in removal of the child from the parents' care or the reasons for continued placement outside the home will not be remedied. The parents have not demonstrated a willingness to make lasting changes from past behaviors. There is no reasonable probability the parents will be able to provide adequately for the children's mental, emotional, or basic needs.

> Continuation of the parent-child relationship poses a threat to the well-being of the child. The children need parents with whom they can form a permanent and lasting bond to provide for their emotional and psychological as well as physical well-being. The children's well-being would be threatened by keeping them in the parent-child relationships with parents whose own choices and actions have rendered them unable to meet the needs of their children.

> . . . .

> For the foregoing reasons, it is in the best interests of [Children] that the parental rights of [Mother] … [and Father] … be terminated and that the children be made available for adoption.

*Appellant's App.* at 43. Mother and Father now appeal.

## Discussion and Decision

[18]   Our Supreme Court has "repeatedly recognized that parental rights are precious and protected by our Federal and State constitutions." *In re E.M.*, 4 N.E.3d 636, 641-42 (Ind. 2014) (citing *In re Adoption of C.B.M.,* 992 N.E.2d 687, 692

(Ind. 2013)) (internal quotation marks omitted). "Accordingly, when seeking to terminate parental rights, DCS must prove its case by 'clear and convincing evidence,' Ind. Code § 31-37-14-2 (2008)—a 'heightened burden of proof' reflecting termination's 'serious social consequences.'" *Id*. at 642 (quoting *In re G.Y.,* 904 N.E.2d 1257, 1260-61 & n.1 (Ind. 2009)). "[W]eighing the evidence under that heightened standard is the trial court's prerogative—in contrast to our well-settled, highly deferential standard of review." *In re E.M.*, 4 N.E.3d at 642. "'We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence.'" *Id*. (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992)). "We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment." *Id*. (citing *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1229-30 (Ind. 2013)).

[19] Reviewing whether the evidence "clearly and convincingly" supports the findings, or the findings "clearly and convincingly" support the judgment, is not a license to reweigh the evidence. *Id*. "Rather, it is akin to the 'reasonable doubt' standard's function in criminal sufficiency of the evidence appeals—in which we do not reweigh the evidence or assess the credibility of the witnesses, and consider only whether there is probative evidence from which a *reasonable jury could have* found the defendant guilty beyond a reasonable doubt." *Id*. (emphasis in original) (internal quotation marks omitted). "That is, we do not

independently determine whether that heightened standard is met, as we would under the constitutional harmless error standard, which requires *the reviewing court itself* to be sufficiently confident to declare the error harmless beyond a reasonable doubt." *Id.* (emphasis in original) (internal quotation marks omitted). Our review must "give 'due regard' to the trial court's opportunity to judge the credibility of the witnesses firsthand," and "not set aside [its] findings or judgment unless clearly erroneous." *K.T.K.,* 989 N.E.2d at 1229 (citing Ind. Trial Rule 52(A)).

[20] Indiana Code section 31-35-2-4(b)(2) provides that a petition to terminate parental rights of a child in need of services must, in pertinent part, allege the following:

> (A) that one (1) of the following is true:
>
> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>
> . . . .
>
> (B) that one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the wellbeing of the child.

. . . .

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

The petitioner must prove each of these elements by clear and convincing evidence. Ind. Code § 31-37-14-2; *see also Castro v. State Office of Family & Children*, 842 N.E.2d 367, 373 (Ind. Ct. App. 2006), *trans. denied*.

Here, the Parents do not contest the juvenile court's findings that Children have been out of their care for more than six months or that DCS deems it a satisfactory plan for the care and treatment of Children that Grandmother is willing to adopt N.W. and S.G. and Aunt is willing to adopt R.B. Instead, Parents argue that DCS failed to prove by clear and convincing evidence that the conditions that resulted in the removal of Children will not be remedied, that the continuation of the parent-child relationship with Parents poses a threat to Children, and that termination of Mother's and Father's parental rights is in Children's best interests.

# I. Mother

[22] Mother contends that the evidence was insufficient to support the juvenile court's findings of fact and conclusion that the conditions that resulted in Children's removal will not be remedied. We disagree.[7]

[23] In determining whether there is a reasonable probability that the conditions that led to Children's removal and continued placement outside the home would not be remedied, we engage in a two-step analysis. *K.T.K.*, 989 N.E.2d at 1231. First, we ascertain what conditions led to Children's placement and retention outside the home, and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* In the second step, the juvenile court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *In re E.M.*, 4 N.E.3d at 643 (quoting *K.T.K.*, 989 N.E.2d at 1231).

---

[7] DCS is required to prove either (i) the conditions resulting in child's placement outside the home will not be remedied, or (ii) the continuation of the parent-child relationship poses a threat to the child's well-being. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 148 n.5 (Ind. 2005). Because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the trial court need only find one of the two elements proven by clear and convincing evidence. *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 373 (Ind. Ct. App. 2006), *trans. denied*. Finding as we do that the juvenile court did not err in finding clear and convincing evidence that the conditions that resulted in Children's removal will likely not change, we need not address the issue of whether Mother poses a threat to Children.

[24] Pursuant to this rule, "trial courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. In addition, DCS need not provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *In re E.M.*, 4 N.E.3d at 643.

[25] Here, Children were removed from Mother's home in connection with her arrest and subsequent prosecution for having hit and injured Z.S. Further inquiry revealed that Mother had a history of being the victim of domestic abuse both as a child and an adult and that Mother historically became involved with and exposed Children to men who were violent. Additional concerns about Mother were her harsh discipline style and that Mother, on occasion, left N.W. alone to care for three to five other children.

[26] During the termination hearings, Case Manager Fristoe testified that Mother's parental rights should be terminated. Case Manager Fristoe testified that, in her opinion, the conditions that resulted in Children being removed from Mother would not be remedied. *Id*. at 313-14. Case Manager Fristoe testified that prior to the trial home visit Mother's house was usually "really clean"; however, during the trial home visit "there were things all over the house [and] there was

food that would be left out." *Id*. at 317. During the four-week trial home visit, Mother did not schedule counseling appointments for S.G., stopped communicating with S.G.'s case manager, and did not return paperwork to S.G.'s school. *Tr*. at 315-16. Case Manager Fristoe made the following observations about Mother: "[s]he allows dangerous men around her children and presents them as father figures, she asks them to call them their fathers; she will not maintain or prioritize [Children's] needs regarding education, mental health, case management; she will not reach out for supports [sic] when she needs anything; she will cut the relatives out of her life who have been a strong support for her and for the kids." *Id*. at 318.

[27] The CASA explained that Children were removed from the home "due to abusive relationship where [Mother] became very overwhelmed with stress and that resulted in an injury to a two year old child[8] where the child was hospitalized," and that Mother "lied about the occurrence." *Id*. at 505. The CASA also testified that there were times that Mother used N.W. to babysit for Children. The CASA stated her concern for the safety of Children because Mother "gets very overwhelmed and doesn't recognize when she's overwhelmed." *Id*. The CASA also cited to problems "regarding inappropriate caregivers" for Children. *Id*. Elaborating on the childcare issue, the CASA stated that "moving toward the trial home visit, it took seven weeks for

---

[8] Mother's intake officer reported that Z.S. was three years old. *DCS Ex.* 1 at 2.

[Mother] to establish childcare." *Id*. at 505-06. With the childcare struggles Mother "[fell] back into the pattern of calling family members at the last minute and demanding that they provide the childcare for her." *Id*. at 507. The CASA also testified that the trial home visit fell apart because Mother "treated [S.G.] very harshly"; "[S.G.] demonstrated very regressive behaviors"; S.G. was struggling educationally, but Mother wasn't appropriately acting on those struggles; concerns arose because childcare "wasn't holding up very strongly"; Mother was not keeping up with Children's therapy, and Mother was not communicating with S.G.'s service provider. *Id*. 508-10.

[28] Mother's brother ("Brother") and Aunt also testified during the termination hearings as to their concern regarding returning Children to Mother. Brother testified that Mother was "entirely capable" of caring for Children, "but she's not shown me a willingness to do what she has to do to really be a good mom like she could be." *Tr*. at 182. Brother described Mother's historical shortcomings, where Mother would rely on Brother's financial support and leave Children with Grandmother and "just check out for a little while." *Id*. at 182-84. Brother admitted that he had "not spent a significant amount of time" at Mother's home, but when he visited he found the conditions unacceptable— "dirty and cluttered; dirty dishes;[and] dirty floor." *Id*. at 185. Elaborating, he said that "the kitchen was filthy and nasty and . . . and dirty dishes in the living room and things like that." *Id*. at 201. He further stated that Mother made too many decisions that exposed Children to "things [and people] they should not be exposed to," and sometimes put her needs before Children's. *Id*.

[29]  Aunt also testified regarding Mother's historical shortcomings. Aunt cited to a childcare problem, which occurred in Chicago, when the caregiver of Children could not find Mother. *Id.* at 274. Aunt noted that Mother's home was usually "rather cluttered and dirty." *Id.* at 250. "Cluttered with clothing and leftover food containers, baby bottles and diapers that should've been either washed or thrown away." *Id.* Mother's ex-boyfriend threatened Mother and had hit Z.S. in Aunt's presence. Aunt also stated that there were times when the family had to deal with Children having lice. *Id.* at 246-50, 259.

[30]  Case Manager Eads testified that, even though Mother had recently been answering Eads's texts and phone calls, Mother had not reached out to work cooperatively with Eads on S.G.'s issues prior to the plan for termination. When asked if she was convinced that Mother's parental rights should be terminated, Case Manager Eads stated that she could not answer the question because she had not had enough "supervised visit time" with the family. *Tr.* at 86-87.

[31]  Wabash Valley Case Manager Evans testified that she "was on the fence" regarding whether Mother's rights should be terminated. *Tr.* at 485. While providing no specifics, Evans testified, "I have not observed [Mother] physically do anything to harm the children, but I do have some concerns that I think need to be addressed because it's important for her address [sic] certain things with them." *Id.* When asked, Case Manager Evans stated that Mother had not shown a willingness to address those issues. *Id.* Explaining, Evans said, "I have voiced my opinion in regards to how she should handle some situations

and most of the time it's an excuse on why she shouldn't go the way that I'm saying." *Id*. Case Manager Evans also testified that Mother yells frequently. Evans said she would give Mother a grade of 78% for her participation throughout the case. *Id*. at 485-86. During the March 5, 2015 hearing, Evans testified that Mother was hesitant to meet "because she really didn't need my attention." *Id*. at 487.

[32] Dr. Vanderwater-Piercy's psychological evaluation of Mother reported that individuals with similar test results have: a tendency toward nonconforming behavior; problems with authority; conflictual interpersonal relationships; and problems with impulsiveness, sensation-seeking, and acting out when bored. *DCS Ex*. 4, *Vanderwater-Piercy Psychological Evaluation* at 10. These individuals also have inflated self-image and problematic behavior. *Id*. The juvenile court noted that the existence of these traits were amply supported by the testimony of Brother and Aunt. The juvenile court also believed that Mother's estrangement from her family, due in part to family's disapproval of Mother's lifestyle, validated Dr. Vanderwater-Piercy's findings that individuals with similar response styles are likely to have a strong need for approval and validation, may lack self-awareness and insight regarding personality flaws and problematic behavior, and have an inflated self-image and sense of competence. *Id*. These individuals perceive and present themselves as having few faults or liabilities with respect to their functioning. *Id*.

[33] The juvenile court, in part, found that Mother's history of domestic violence began when she was a child; Mother was sexually abused by a family friend and

abused and neglected by her mother. *Appellant's App.* at 39. Since the age of seventeen, Mother had made bad decisions regarding her relationships with men, some of whom had criminal records and all of whom were physically abusive to Mother; R.B. was conceived through an act of rape. *Id.* Children were placed outside the home because Mother had hit and injured Z.S. Children remained in relative placement because of Mother's unwillingness or inability to find suitable childcare, refusal to take responsibility for her actions, emotional instability, and unwillingness or inability to see what she has done wrong, coupled with a lack of understanding as to the nature and requirements of parenting. *Id.* at 40. Mother had made inappropriate childcare decisions, including leaving eleven-year-old N.W. to care for three to five younger children, and on another occasion, allowing children to be cared for by an individual who did not have prior approval from DCS. *Id.* at 39, 40. Mother did not plan ahead for childcare, which resulted in last minute emergencies and, on one occasion, Mother asking Children to lie about who was watching them. *Id.* at 40.

[34] The juvenile court also found that Mother did not fully understand the nature and requirements of parenting "such as putting the needs of the children before her own; whether it is financial, emotional support, time with the children, or meeting physical and emotional needs." *Id.* at 40-41. Mother is self-centered and simply does not view this as a parenting deficit. The trial home visit did not go well, as evidenced by S.G. being happy and well-adjusted once placed with Grandmother, but when the trial home visit neared, S.G.'s behaviors

deteriorated, and she had difficulty in school. *Id*. at 42. Prior to the trial home visit, DCS and the CASA reminded Mother about the importance of continuing therapy for the Children, especially as S.G.'s behavioral issues were increasing. *Id*. It was a difficult time for the school, and school officials reported that at times they were unable to reach Mother. *Id*. Once the trial home visit ended, many of S.G.'s negative behaviors decreased, and she was doing much better overall until visits with Mother increased again, when S.G. began displaying similar behaviors again. *Id*. The juvenile court also observed that, due to her childhood, Mother has developed an inability to trust others. *Id*. Mother has an unwillingness to cooperate, needs to be in control of her life and circumstances, and is oppositional defiant to the detriment of Children. *Id*. The personality construct as described by Dr. Vanderwater-Piercy renders Mother incapable of confidently raising Children under circumstances where Children would be safe and healthy. *Id*. at 42-43.[9]

[35] As Mother correctly notes on appeal, some of the juvenile court's findings of fact are historical in nature. The importance of these events is not whether they happened in the past, but whether they provide any insight into future conditions. Here, the juvenile court had the difficult task of determining whether there was a probability that these historical conditions would not be remedied. This case, from CHINS through termination of parental rights, took

---

[9] The juvenile court did not include citations to the record in its findings of fact—an omission that somewhat hampered our review.

place over a period of more than two years. A great deal of evidence, including three volumes of exhibits and more than six hundred pages of testimony, was presented to the juvenile court. Numerous witnesses testified. The evidence before the juvenile court was that Mother had historical issues of being overwhelmed while caring for Children, using excessive discipline on Children, and exposing Children to individuals who were violent. In the opinion of Case Manager Fristoe and the CASA, Mother returned to her old ways during the trial home visit, and the behavior of S.G. and R.B. had regressed. *Tr.* at 315-17, 505-10. Case Manager Fristoe concluded that the conditions that resulted in Children being removed from Mother would not be remedied. *Id.* at 313-14.

[36] The juvenile court heard the testimony and saw the demeanor of the witnesses. From this vantage point, the juvenile court sifted through the evidence to conclude, "[t]he parents have not demonstrated a willingness to make lasting changes from past behaviors," and "there is no reasonable probability the parents will be able to provide adequately for children's mental, emotional, or basic needs." *Appellant's App.* at 43. Mother urges this court to consider that she maintained housing and employment, among other factors. This is a request that we reweigh the evidence and judge the credibility of witnesses, which we will not do. *In re E.M.*, 4 N.E.3d at 642. We cannot say that it was error for the juvenile court to find that the conditions that resulted in the termination of Mother's parental rights will not be remedied.

[37] Mother next argues that there was insufficient evidence to prove that termination was in the best interests of Children. In determining the best

interests of a child, the trial court must look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). "In so doing, the trial court must subordinate the interests of the parent to those of the child." *Id.* Children have a paramount need for permanency, which our Supreme Court has deemed a central consideration in determining a child's best interests. *In re E.M.*, 4 N.E.3d at 647-48. Courts need not wait until a child is harmed irreversibly before terminating the parent-child relationship. *Id.* The testimony of service providers may support a finding that termination is in the child's best interests. *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010), *trans. dismissed*; *see Stewart v. Ind. Dep't of Child Servs.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009) (we have repeatedly recognized that testimony of family case manager and CASA, in addition to evidence demonstrating reasonable probability that the conditions that resulted in removal of child would not be remedied, is sufficient to show by clear and convincing evidence that termination is in child's best interests).

[38] During the home visit, Mother had been unable to accomplish all of the tasks assigned to her by DCS and could not maintain the therapy appointments required to address S.G.'s mental health issues. Children were close to their maternal relatives. At the time of the termination hearings, N.W. and S.G. had lived with Grandmother, and R.B. had lived with Aunt, for more than two years. In addition to the testimony of Case Manager Fristoe and the CASA, the juvenile court heard testimony that Mother and Children are clearly bonded and want to live together. For many of the above-cited reasons, Case Manager

Fristoe and the CASA made clear their opinions that it was in Children's best interests to terminate Mother's parental rights. *Tr.* at 318-19, 504. Brother testified, "[I]t's been proven over and over to me that it's just what's going to be best for the girls is that [Mother's] not in charge of their care anymore. And maybe what's best for her too." *Id.* at 199. Brother also testified that there had been times when Mother did what she needed to do to take care of Children and herself, but "those stretches seem rare in retrospect," especially over the course of thirteen years. *Id.* at 200. It was the juvenile court's duty to review the record, assess the credibility of the witnesses, weigh the evidence, and determine the best interests of Children. The juvenile court's determination that termination of Mother's parental rights is in S.G.'s best interests is supported by clear and convincing evidence and, therefore, is not clearly erroneous.

## II. Father

[39] Father argues that the evidence was insufficient to support the termination of his parental rights. S.G. testified that she loves Father and would like to see him again. *Tr.* at 398. Father likewise testified that he loves S.G. a lot and has a good relationship with her. *Id.* at 603. Father explained that he had not attended most of the hearings because his driver's license was suspended, and his vehicles were not working properly. *Id.* While admitting to having a pending misdemeanor charge, Father expressed the belief that it was going to be dismissed. *Id.* at 601-02. Father urged the juvenile court not to terminate his parental rights, saying, "I have nothing to do with what's going on with this

situation with [Mother]. Me and [S.G.] have a really good relationship and I don't think I should get my parental rights deleted because of somebody else's problems." *Id*. at 604.

[40] Case Manager Fristoe testified that Father has a history of substance abuse and has a major criminal conviction. Father was ordered to participate in certain services and have visitation with S.G. Although Father participated in an assessment, Case Manager Fristoe testified that he "didn't follow through with anything." *Id*. at 320. Additionally, Case Manager Fristoe testified that while Father's home was a ninety-minute drive away, he had not, to her knowledge, made any effort to reach out and communicate with S.G. *Id*. at 320-21. Mother testified that once the case started, Father's contact with S.G. became "practically non-existent." *Id*. at 572.

[41] The majority of the juvenile court's findings and conclusions focused on whether Mother's parental rights should be terminated. The juvenile court, however, made the following findings and conclusions regarding Father. Father's relationship with Mother lasted one year, and Father was physically abusive towards Mother; Mother left Father after he hit her while she was pregnant with S.G. *Appellant's App.* at 39. Father has been in S.G.'s life sporadically, but he has only seen her twice since he was released from prison after serving time for a cocaine conviction. Father lives about ninety minutes from S.G. and has not played a significant role in her life. *Id.* at 43.

[42]     While S.G. was not removed from Father's care, to maintain his parental rights, DCS required Father to complete certain services. While Father completed an assessment, he did not complete any of the other services. Equally important, Father did not increase his contact with S.G. Father has shown little interest in taking responsibility for S.G.'s care. The juvenile court's determination that termination of Father's parental rights is in S.G.'s best interests is supported by clear and convincing evidence and therefore is not clearly erroneous.

## Conclusion

[43]     "Decisions to terminate parental rights are among the most difficult our trial courts are called upon to make." *In re E.M.*, 4 N.E.3d at 640. "They are also among the most fact-sensitive—so we review them with great deference to the trial courts, recognizing their superior vantage point for weighing the evidence and assessing witness credibility." *Id*. Over the four-day hearing, the juvenile court was presented with conflicting evidence through the testimony of numerous witnesses and three volumes of exhibits. "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id*.

[44]     We will reverse a termination of parental rights "only upon a showing of 'clear error'—that which leaves us with a definite and firm conviction that a mistake has been made." *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997)

(quoting *In re Egly*, 592 N.E.2d at 1235). Based on the record before us, we cannot say that the juvenile court's termination of Mother's or Father's parental rights to Children was clearly erroneous. We affirm the juvenile court's judgment.

Affirmed.

Mathias, J., and Brown, J., concur.